ORAL ARGUMENT NOT YET SCHEDULED

Nos. 11-1280 and 11-1322

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

KLB INDUSTRIES, INC., D/B/A NATIONAL EXTRUSION AND
MANUFACTURING CO.,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent,

and

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW,
Intervenor.

ON PETITION FOR REVIEW OF A DECISION AND ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
CASE NUMBERS 8-CA-37672 AND 8-CA-37835

_____

**PETITIONER KLB INDUSTRIES, INC.'S OPENING BRIEF**

_____

Kerry P. Hastings
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
Phone:  (513) 381-2838

Counsel for Petitioner KLB Industries, Inc.

12405704.1

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.      Parties and Amici

The International Union, Automotive, Aerospace and Agricultural Implement Workers of America, UAW ("Union") was the Charging Party and KLB Industries, Inc. ("KLB") was the Respondent in the proceedings below before the National Labor Relations Board ("Board"). Before this Court, KLB is the Petitioner and the Board is the Respondent. The Union is an intervenor. No amici were involved in the proceedings below. To date, no amici have sought to participate in the matter before this Court.

Pursuant to Circuit Rule 26.1, KLB respectfully states that: (1) KLB is a privately held, for-profit corporation that manufactures, processes, and sells aluminum extrusions; (2) KLB has no parent corporation; and (3) there is no publicly held corporation that owns 10% or more of KLB.

### B.      Rulings Under Review

KLB seeks review of the Board's "Decision and Order" dated July 26, 2011 in KLB Industries, Inc. d/b/a/ National Extrusion & Manufacturing Co., 357 NLRB No. 8 (2011).

## C.    **Related Cases**

The Board's decision at issue has not previously been before this Court or any other court.  There are no cases related to this one currently pending in this Court or any other court to KLB's knowledge.

Respectfully submitted,

/s/ Kerry P. Hastings
Kerry P. Hastings
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
Phone:  (513) 381-2838
Fax:  (513) 381-0205
E-mail:  hastings@taftlaw.com

Attorney for Petitioner KLB
Industries, Inc.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

    A.    Parties and Amici ........................................................................... i

    B.    Rulings Under Review ...................................................................... i

    C.    Related Cases ................................................................................. .ii

TABLE OF AUTHORITIES ……………………………………………… vi

GLOSSARY ...................................................................................... viii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES ................................................................... 1

STATUTES AND REGULATIONS ....................................................... 2

STATEMENT OF FACTS ................................................................... 3

    A.    Background. ................................................................................... 3

    B.    Collective Bargaining ..................................................................... 3

        1. KLB and the Union had very different bargaining outlooks ................ 3

        2. The September 20 bargaining session .................................................. 4

        3. The September 21 bargaining session .................................................. 5

        4. The September 25 bargaining session .................................................. 6

        5. The September 28 bargaining session .................................................. 6

        6. The September 30 bargaining session .................................................. 7

        7. The Union moved further away from KLB on October 2 ..................... 7

        8. KLB made its Final Offer on October 3 ................................8

C.    The Union Made A Voluminous Information Request Immediately After KLB Made Its Final Offer And The Mediator Said The Parties Were At Impasse................................................................................9

D.    KLB Made A Timed Offer In A Final Attempt To Reach Agreement..... 10

E.    The Union Rejected The Timed Offer. ................................. 11

F.    Further Bargaining Was Unproductive. ................................ 12

G.    KLB Responded To The Information Request. ....................... 13

H.    KLB Commenced A Lockout In Support Of Its Final Offer. ............ 13

SUMMARY OF ARGUMENT ................................................ 14

STANDING ................................................................. 18

ARGUMENT ................................................................ 19

A.    Standard of Review .................................................... 19

B.    KLB Did Not Unlawfully Fail To Provide Financial Information ........... 19

    1. The requested information was irrelevant because KLB did not plead poverty ....................................................... 19

    2. KLB adequately responded to the costs savings request ..................... 29

    3. The Union's information request was made in bad faith ..................... 30

C.    The Lockout Was Lawful................................................. 33

    1. The Board majority's ruling that the lockout was unlawful should be set aside because it rested solely on the erroneous ruling that KLB unlawfully failed to provide information .................................. 33

2.  The Board's finding that KLB bargained in good faith overall requires the conclusion that the lockout in support of KLB's good faith bargaining position was lawful ..................................................... 34

3.  The lockout was lawful under the Board's recently announced standard which the Board majority failed to apply ............................. 35

4.  The Board's own findings show a deadlock over health insurance unrelated to any information request ................................... 43

D.  KLB Lawfully Cancelled Health Insurance For Lawfully Locked Out Employees ................................................................................. 44

CONCLUSION ........................................................................................... 48

CERTIFICATE OF COMPLIANCE ……………………………………..49

CERTIFICATE OF SERVICE ………………………………………….. 50

# TABLE OF AUTHORITIES[1]

**Page**

A-1 Door & Building Solutions,
   356 NLRB No. 76 (2011)................................................................27

ACF Indus., LLC,
   347 NLRB 1040 (2006)................................................................32

Avecor, Inc. v. NLRB,
   931 F.2d 924 (D.C. Cir. 1991)......................................................19

Caldwell Mfg. Co.,
   346 NLRB 1159 (2006)................................................................27

Central Ill. Publ. Serv. Co.,
   326 NLRB 928 (1998)..................................................................44

Cincinnati Steel Castings Co.,
   86 NLRB 592 (1949)………………………………………………………30

Clemson Bros., Inc.,
   290 NLRB 944 (1988)..................................................................41

*ConAgra, Inc. v. NLRB,
   117 F.3d 1435 (D.C. Cir. 1997)......................15, 19, 22, 29, 34, 41

*Concrete Pipe & Products Corp.,
   305 NLRB 152 (1991)..................................................................20

E.I. Du Pont & Co.,
   276 NLRB 335 (1985)..................................................................28

Globe Business Furniture, Inc.,
   290 NLRB 841 (1988)..................................................................41

Horsehead Resource Development Corp. v. NLRB,
   154 F.3d 328 (6th Cir.1998).........................................................35

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

*Nielsen Lithographing Co.,
    305 NLRB 697 (1991)..................................................................15, 20

NLRB v. Truitt Mfg. Co.,
    351 U.S. 149 (1956).............................................................................20

NLRB v. Transportation Management Corp.,
    462 U.S. 393 (1983).............................................................................26

NLRB v. United States Postal Service,
    8 F.3d 832 (D.C. Cir. 1993).........................................................46, 47

North Star Steel Co.,
    347 NLRB 1364 (2006).......................................................................22

*Peterbilt Motors Co.,
    357 NLRB No. 13 (2011).......................................................17, 35, 39

Procter & Gamble Mfg. Co.,
    160 NLRB 334 (1966).........................................................................30

Sargent-Welch Scientific Co.,
    208 NLRB 811 (1974).........................................................................44

Sherwin-Williams Co.,
    269 NLRB 678 (1984)…………………………………………….. 45

Sierra Bullets, LLC,
    340 NLRB 242 (2003).........................................................................44

Simplex Wire & Cable Co.,
    245 NLRB 543 (1979).........................................................................45

Stroehmann Bakeries, Inc. v. NLRB,
    95 F.3d 218 (2d Cir. 1996)............................................................23, 38

Trading Port, Inc.,
    219 NLRB 298 (1975).........................................................................45

# **GLOSSARY**

"Act" means National Labor Relations Act.

"ALJ" means Administrative Law Judge.

"Alternative Insurance" means KLB's high deductible health insurance proposal.

"Board" means National Labor Relations Board.

"D.A. ___" means Deferred Appendix.

"Final Offer" means KLB's contract offer made on October 3.

"G.C. Exh. __" means General Counsel Exhibit.

"KLB" means KLB Industries, Inc.

"KLB Exh. __" means KLB Exhibit.

"Order __" means the National Labor Relations Board's July 26, 2011 order in KLB Industries, Inc. d/b/a/ National Extrusion & Manufacturing Co., 357 NLRB No. 8 (2011).

"Tr. ___" means the transcript of the hearing before the Administrative Law Judge.

"Union" means Intervenor International Union, Automotive, Aerospace and Agricultural Implement Workers of America, UAW.

## JURISDICTIONAL STATEMENT

On July 26, 2011, the Board issued the Order in this case.  On August 10, 2011, KLB filed the pending petition for review of the Board's Order.  The Board filed a cross-application for enforcement on September 13, 2011.  This Court consolidated KLB's petition for review and the Board's cross-application for enforcement.

This Court has jurisdiction pursuant to 29 U.S.C. § 160(f).

## STATEMENT OF ISSUES

A.     Did the Board majority err when it concluded that KLB unlawfully failed to provide information to the Union?

1.     Did the Board majority err when it concluded that KLB had to provide financial information to the Union when KLB made only a generalized claim that it needed to be more competitive and never claimed to be financially unable to meet the Union's bargaining demands?

2.     Did the Board majority err when it concluded the Union's information request was not made in bad faith when, among other indicia of bad faith, the Union's information request was made the day after KLB presented its Final Offer and the federal mediator said the parties were at impasse?

3.     Did the Board majority err when it concluded that KLB's undisputed provision to the Union of projected cost savings associated with KLB's

1

wage proposal was inadequate when the Union already had all of the information

necessary to verify KLB's projected savings?

      B.     Did the Board majority err when it concluded the lockout in support

of KLB's Final Offer was unlawful when the Board found that KLB bargained in

good faith to try to reach agreement and when there is no evidence the Union's

information request, which was made after KLB had made its Final Offer,

materially affected bargaining?

      C.     Did the Board err when it concluded that KLB was legally required to

continue to provide health insurance to locked out employees even if the lockout

was lawful?

**<u>STATUTES AND REGULATIONS</u>**

29 U.S.C. § 158

    (a)    Unfair labor practices by employer
           It shall be an unfair labor practice for an employer –

* * *

        (5) to refuse to bargain collectively with the representatives of his
           Employees, subject to the provisions of section 159(a) of this title.

## STATEMENT OF FACTS

### A.    Background[2]

KLB produces aluminum extrusions at a facility in Bellefontaine, Ohio. (Order 9; D.A. ____)  KLB and its predecessor have had a bargaining relationship with the Union since 1968.  KLB took over the business in 1997 and successfully negotiated three collective bargaining agreements with the Union since that time. (Id.)  KLB is a small company; the bargaining unit totaled 16 employees in September.  (Id.)  The collective bargaining agreement at issue was scheduled to expire on September 30.  (Id.)

### B.    Collective Bargaining[3]

#### 1.    KLB and the Union had very different bargaining outlooks.

KLB faced challenging business conditions in 2007.  KLB faced increasing competition from Asian manufacturers while at the same time its production and health care costs were rapidly rising.  (Tr. 1156; D.A. ____)  At the same time, KLB's level of production was declining.  (Tr. 1151; D.A. ____)  KLB had lost a major customer that negatively affected its revenues by about a million dollars a year.  (Tr. 1151; D.A. ____; KLB Exh. 13; D.A. ____)  In September 2007, KLB projected a significant decline in revenues compared to 2006.  (Tr. 1154; D.A. ____)

---

[2] All date references are for calendar year 2007 unless otherwise indicated.

[3] As the Board found that KLB bargained in good faith overall (Order 1 n.2; D.A. ____), KLB will not address numerous issues the parties discussed and resolved in negotiations.  KLB will focus on wages and health insurance.

And KLB in fact suffered about a $1.1 million decline in net sales in 2007

compared to 2006.  (Tr. 1154; D.A. ___; KLB Exh. 13; D.A. ___)

The ALJ recognized the parties' different bargaining outlooks:

> As reflected in their opening proposals, the parties
> entered negotiations with vastly different goals.  The
> Union felt that employees' wages were low, and
> anticipated and sought wage increases over the life of the
> new contract with additional economic and noneconomic
> changes that would benefit employees.  Although I
> attribute it to posturing, at one or more times in
> negotiations Young indicated to KLB that the union
> employees would not agree to a concessionary contract.
> KLB, on the other hand, came to the table determined to
> cut labor costs.  Its goal was to save $100,000 annually.

(Order 10-11; D.A. ___)

Craig Johnson, controller and treasurer for KLB, and chief negotiator Brian

Wakefield, KLB's lawyer, represented KLB at the table.  (Order 9; D.A. ___)

Negotiating on behalf of the Union were international Union representative Konrad

Young, and three members of the Unit Committee, Ellen Potter, Jack Conway and

Roger Leugers.  (Id.)  Federal Mediator Don Ellenberger also attended bargaining

sessions.  (Id.)

### 2.    The September 20 bargaining session

Young had set aside the last two weeks of September for negotiations.

(Order 10; D.A. ___)  The parties began negotiations on September 20.  (Id.)

The Union opened with a proposal to substantially increase wages -- $2 in year one and $1 in each of years two and three of the successor contract in addition to a monthly cost of living adjustment. (Order 11; D.A. ___)  KLB's opening offer sought a 20% reduction in wages in the first year of the contract with no change in wages in years two or three. (Id.)  KLB also sought substantial changes to KLB's costly insurance benefits, including a 25% employee contribution towards the premiums. (Id.)  Under the current contract, employees contributed $35 per week towards the premiums. (Order 12; D.A. ___)

### 3.    The September 21 bargaining session

The parties returned to the bargaining table on September 21. (Id.)  KLB made a new health insurance proposal (the "Alternative Insurance") which was a high deductible plan. (Id.)  KLB provided the Union with a summary of the plan and its benefits (G.C. Exh. 8; D.A. ___) and told the Union that this plan would save it $47,000. (Order 12; D.A. ___)  Under the Alternative Insurance proposal, the employee premium contributions would remain unchanged at $35 per week. (Id.)  Further, KLB offered to provide annual subsidies of $1,000 for individuals and $2,000 for families to help offset the higher deductibles. (Tr. 754, 1006; D.A. ___)

### 4.     The September 25 bargaining session

During the September 25 bargaining session, Young told KLB that the
Union would not accept a concessionary contract.  (Tr. 695, 1016; D.A. ___; Order
10; D.A. ___)  He added that if KLB wanted concessions they would have to
"show him their books."  (Tr. 1017; D.A. ___)  Wakefield responded that KLB
was **not** pleading poverty and that it was financially able to pay the wages
demanded by the Union.  (Id.)

On health insurance, KLB offered to maintain the current insurance with an
80/20 premium split (while also offering the Alternative Insurance proposal should
the Union prefer that proposal).  (Order 12; D.A. ___)  The Union made a
counterproposal on health insurance where it would accept KLB's Alternative
Insurance proposal if KLB provided annual subsidies of $1500 for individuals and
$3500 for families (which equaled the annual deductibles).  (Order 13; D.A. ___)

### 5.     The September 28 bargaining

On September 28, KLB withdrew its original health insurance proposal so
the parties could focus on the Alternative Insurance.  (Order 13; D.A. ___)  KLB
offered to increase its subsidy to $3,000 for families (from $2,000) against an
annual deductible of $4,000.  (Id.)

### 6.    The September 30 bargaining session

The parties agreed to extend the contract, which would have expired on September 30.  (Order 13-14; D.A. ___)

During the September 30 negotiations, KLB made a global proposal that incorporated various tentative agreements.  (Order 14; D.A. ___)  In response, the Union made a comprehensive proposal that included acceptance of KLB's Alternative Insurance proposal.  (Id.)  With respect to wages, the Union proposed no increase in the first year, a 20 cent-per-hour increase in the second year, and a 10 cent-per-hour increase in the third year.  (Id.)  The ALJ declined to resolve conflicting evidence regarding whether the Union's offer was a "package" that would expire if KLB did not accept it.  (Order 14 n.11; D.A. ___)  KLB did not view this Union offer as a "package" proposal.  (Order 15; D.A. ___)

The Union conducted a membership meeting that afternoon and decided not to accept KLB's offer.  (Id.)  The Union may have held a ratification vote at that time.  (Order 15 n.12; D.A. ___)

### 7.    The Union moved further away from KLB on October 2.

Believing that the parties were close to an agreement and pleased with what it believed to be the Union's acceptance of the Alternative Insurance, KLB made a new offer which made substantial movement towards the Union.  (Order 15; D.A. ___)  KLB withdrew its 401(k) proposal, keeping the "match" at 6%, and

substantially lowered the wage reduction previously sought from a 20% reduction in year one to a 12% reduction spread over the life of the contract.  (Id.)  After this KLB proposal, the outstanding issues were wages, bonuses, and vacation.  (Id.)

The Union responded with a proposal that moved dramatically away from KLB.  The Union substantially increased its wage demand; rather than zero in year one, $.20 in year two and $.10 in year three (the Union's September 30 offer), the Union now sought $1.50 in year one, $0.80 in year two and $0.80 in year three. (Id.)  The Union reinstated numerous other demands that it had dropped in its September 30 offer.  (Id.)  On health insurance, KLB believed the parties still had a tentative agreement based on the Union's September 30 acceptance of KLB's Alternative Insurance proposal (id.), but Union witnesses claimed the Union instead proposed the current health insurance.  (Order 15 n.14; D.A. ___)

The bargaining session ended angrily and abruptly after the Union made this offer.  (Order 15 and Order 15 n.13; D.A. ___)

## 8.    KLB made its Final Offer on October 3.

Disappointed with the bargaining session on October 2, KLB gave notice to the Union on October 3 that it was going to end the contract extension on October 7.  (Order 15; D.A. ___)

KLB also made a Final Offer to the Union.  (Id.)  KLB's Final Offer contained further movement towards the Union.  KLB withdrew its proposal to

eliminate a week of vacation for employees who had more than 20 years of service. (Order 16; D.A. ___)  KLB softened its bonus proposal.  (Order 15; D.A. ___) KLB maintained its October 2 wage proposal despite the Union's regression on wages on October 2.  (Order 16; D.A. ___)

The Union responded by proposing wage increases of $1.25 per hour for the first year and additional increases of 80 cents per hour for the second and third years.  (Id.)  On health insurance, the Union proposed:  "will agree with the new Ins. Plan at $15.00/wk."  (Id.)  KLB understood this to mean the Union accepted the Alternative Insurance if KLB decreased the employees' weekly contribution from $35 (the current weekly contribution) to $15.  The Union also made other proposals that would have added to KLB's costs.  (Id.)  KLB responded by maintaining its Final Offer.  (Id.)

After KLB stated that its October 3 offer was its final offer, Mediator Ellenberger said "I guess we're at impasse then."  (Id.)  Young disagreed.  (Id.)

**C.    The Union Made A Voluminous Information Request Immediately After KLB Made Its Final Offer And The Mediator Said The Parties Were At Impasse.**

On October 4, the Union sent KLB a lengthy information request.  (Order 15-16; D.A. ___; G.C. Exh. 32; D.A. ___)  The Union sought information regarding health insurance and KLB's projected cost savings regarding bonuses.

(Id.)  The Union also sought information about KLB's business, including KLB's customers and pricing.  (Id.)

### D.    KLB Made A Timed Offer In A Final Attempt To Reach Agreement.

The parties returned to the bargaining table on October 5.  (Order 17; D.A. ___)  The parties broke into caucuses at this session and Ellenberger shuttled between them.  (Id.)

After consulting with Ellenberger, KLB decided to make a "timed offer" that would further improve KLB's wage proposal.  (Id.)  The concept was an initial wage reduction that would eventually be eliminated over the course of a four-year contract.  (Id.)  If the Union did not accept KLB's timed offer by a specific deadline, KLB would revert to its Final Offer.  (Id.)

After some shuttling between the parties, Ellenberger, Johnson and Wakefield met with Young (without the other members of the Union committee) in a "sidebar" meeting at KLB's office.  (Id.)  During the sidebar, the parties developed the timed offer.  (Id.)  Wakefield asked Young what it would take to get a ratified contract.  (Id.)  Young suggested a $500 signing bonus.  (Id.)

Based on these discussions with Young and specifically designed to get a ratified contract, KLB's timed offer moved significantly beyond its Final Offer. (Id.)  Rather than reductions over the three-year life of the contract at 8%, 2% and 2%, KLB's timed offer extended the contract to four years and offset a $1.00 per

hour (approximately 10%) reduction in wages in year one with 2.75% wage increases in years two, three and four.  (Id.)  KLB offered the $500 signing bonus Young had said would help reach an agreement.  (Id.)  At Young's request, KLB created a chart to help him present this proposal to the unit.  (Id.)  To try to resolve a health insurance dispute, KLB offered to provide the same medical coverage under the Alternative Insurance as had been provided under the current health insurance instead of KLB's preferred "substantially similar" coverage.  (Order 18; D.A. ___)

KLB's timed offer breached the economic parameters it had initially established for these negotiations.  (Tr. 1199; D.A. ___)  KLB made this offer to try to secure an immediate agreement; Johnson thought the timed offer would be accepted by the Union.  (Tr. 1200; D.A. ___)

During the October 5 sidebar meeting, Wakefield asked Young when he could present the timed offer to the unit members.  (Tr. 1075; D.A. ___)  Young said he could meet with them by October 8, so KLB set the expiration of the timed offer for 11:59 p.m. October 8.  (Order 17; D.A. ___)

### E.     The Union Rejected The Timed Offer.

The Union met and discussed both the Final Offer and the timed offer on October 8.  (Order 18; D.A. ___)  Based on the vote taken at this meeting, Young called Johnson on October 8 and told him that he had presented the timed offer as

neutrally as possible and that it had been rejected.  (Order 18; D.A. ___; Tr. 1200;

D.A. ___)  As noted on the cover of the timed offer, KLB returned to its Final

Offer.  (G.C. Exh. 35; D.A. ___; Order 18; D.A. ___)

The Union considered both the timed offer and the Final Offer without **any**

of the information it had requested on October 4.  The Union **never** claimed it

could not assess its bargaining position or that it needed the information requested

before it voted.

### F.    Further Bargaining Was Unproductive.

The parties next met on October 10.  There was a brief joint session.  While

the parties were together, the Union told KLB that the timed offer's wages were

unacceptable but that the insurance seemed okay.  (Order 18; D.A. ___)  The

Union proposed a three year contract with $0.80 wage increases each year.  (Id.)

KLB adhered to its Final Offer.  (Tr. 1081; D.A. ___)

The parties also met on October 16.  (Order 18; D.A. ___)  The meeting

lasted only a few minutes and neither side made any new proposals.  (Id.)  KLB

again told the Union that the Final Offer was indeed KLB's final offer.  (Id.)

The parties engaged in further bargaining after the lockout.  On each

occasion, KLB adhered to its Final Offer.  (Tr. 774-775; D.A. ___)  On January 30,

2008, the Union returned to a health insurance proposal based on the health

insurance set forth in the expired collective bargaining agreement instead of the

Alternative Insurance.  (Order 20-21; D.A. ___)  On March 28, 2008, the Union continued to propose the old health insurance, but at an 80 percent/20 percent split. (Order 21; D.A. ___)  The Union made wage proposals, but never made a wage proposal that came anywhere near KLB's Final Offer.  (Order 20-21; D.A. ___)

There is no evidence the Union raised any issues about the October 4 information request at any of these bargaining sessions.

### G.    KLB Responded To The Information Request.

On October 18, KLB formally responded to the Union's October 4 information request.  (Order 18-19; D.A. ___)  KLB provided the information requested by the Union on the wage reduction cost savings and the savings KLB would gain from its bonus proposal.  (Id.)  KLB told the Union the information requested about health insurance was unavailable.  (Order 18; D.A. ___)  KLB objected to providing information about its customers and other financial information based on relevance.  (Order 18-19; D.A. ___)

### H.    KLB Commenced A Lockout In Support Of Its Final Offer.

On October 19, KLB informed the Union that it would begin a lockout on October 22.  (Order 20; D.A. ___)  After learning about the planned lockout, the Union objected to KLB's response to the information request and to the lockout on October 21.  (Id.)  The lockout began on October 22.  (Id.)

## **SUMMARY OF ARGUMENT**

KLB did not violate the Act when it did not provide information about its customers and business or when it engaged in a lockout in support of its Final Offer after engaging in overall good faith bargaining. KLB never "pled poverty." (Order 3 n.7; D.A. ___) KLB only made a generalized claim of a desire to be more competitive to justify its bargaining position. This is **not** a case where an employer made a **specific** claim like: "Losing General Motors as a customer cost the company $20 million last year, which threatens the existence of the business and requires concessions." Perhaps a claim that specific could require an employer to provide substantiating information. But KLB did nothing of the sort.

A generalized competitiveness claim is insufficient to make the information at issue (which has nothing to do with terms and conditions of employment) relevant. The Board dissent correctly concluded:

> In the present case, [KLB] made a general claim about a need to maintain or improve its competitive position in the global and domestic markets in support of its proposal for wage concessions. The only competitors specifically identified were those in the Asian markets. This is routine negotiating verbiage (or at least it will have been until the present decision issues) about a routine aspect of any employer's business concerns. For that matter, there is no record evidence that [KLB's] negotiators ever claimed an **inability** to compete or said that it had lost or was losing customers, that competitors were undercutting its prices, and that it had to outsource bargaining unit work in order to meet competition. It simply expressed a desire to cut wages in order to remain

> competitive or become more competitive.  Quite clearly
> this claim would not trigger an obligation to open
> [KLB's] financial books to the Union or to produce a list
> of competitors, and it should no more trigger an
> obligation to produce copious non-unit information about
> present and past customers, job quotes, product pricing,
> outsourcing, and marketing plans.

(Order 6; D.A. ___) (footnotes omitted)

The dissent's conclusion is confirmed by precedent from the Board and this

Court.  See Nielsen Lithographing Co., 305 NLRB 697 (1991).  In ConAgra, Inc.

v. NLRB, 117 F.3d 1435 (D.C. Cir. 1997), this Court found the employer's

"radical" proposal to cut wages explained by the "need to be competitive" and the

desire for "the company to continue" did not require the employer to produce

financial information about its customers, competitors, sales to competitors, and

other financial information having nothing to do with terms and conditions of

employment.  Id. at 1437-1438.  Finding the Board's contrary result "rests on an

unexplained (indeed an unacknowledged) departure from the Board's precedent in

Nielsen and other decisions, we will not enforce the portions of the order that rest

upon that finding."  Id. at 1444.

In addition, the Board should have found that the Union's information

request was not made in good faith.  The Union made this request only after KLB

made its Final Offer and the related discussion of impasse.  The Union then

proceeded to:  (1) bargain with KLB and make offers that were regressive

compared to the Union's September 30 offer **made before the information request**; (2) help KLB develop and submit KLB's timed offer to the membership for ratification; and (3) engage in several additional bargaining sessions after rejecting the timed offer all without mentioning the information request. The Union only invoked the information request after KLB announced its intent to engage in a lockout. Under these circumstances, the Board should have found the information request was made for tactical reasons having nothing to do with the information at issue.

As KLB did not have to provide the information at issue, the Board's ruling that the lockout was unlawful (which rests solely on the alleged failure to provide information) should not be enforced as well.

The Board's ruling that the lockout was unlawful should not be enforced even if KLB unlawfully failed to provide information to the Union. The Board found that KLB bargained in good faith overall. (Order 1 n.2; D.A. ___) The Board dissent correctly recognized:

> [T]he General Counsel has failed to show that the refusal of information had any impact on the parties' subsequent negotiations, as must be shown in analogous cases to determine whether unfair labor practices have precluded the possibility of reaching a good-faith bargaining impasse. [KLB's] proposals for wage concessions were not themselves unlawful, and the parties had bargained about them to the point of entrenched positions verging on impasse **before the Union even made its information request.** The subsequent lockout was for

> the legitimate purpose of pressuring the Union to agree to [KLB's] lawful bargaining proposals.  **The refusal to provide information had nothing to do with it.**

(Order 8; D.A. ___) (emphasis added)

There is no evidence that bargaining was hindered in any respect, much less materially hindered, by KLB's objection to the Union's information request under these particular circumstances.  As KLB never pled poverty, the Union knew all along that KLB could afford to meet the Union's wage demands, but was unwilling to do so.  The Union made its best pre-lockout offer on September 30, **before the October 4 information request.**  The Union regressed significantly from its September 30 offer on October 2, **before the October 4 information request**. KLB made the Final Offer (which the lockout supported) on October 3, **before the October 4 information request**.  (Order 15-16; D.A. ___)  The Union assessed KLB's Final Offer and presented KLB's timed offer to its membership for ratification on October 8 without claiming to need information to assess either offer.  (Order 18; D.A. ___)  On October 10, the Union told KLB it rejected the timed offer's wages (more generous than the Final Offer) because they were "unacceptable," **not because the Union needed information.**  (Id.)

In finding KLB's lockout unlawful, the Board majority disregarded its own recent decision in Peterbilt Motors Co., 357 NLRB No. 13 (2011).  The Board stated the legal standard as follows:  "Although nowhere expressly stated, the

standard consistently, if implicitly, applied by the Board is that where the unlawful withholding of the information did not **materially affect** the progress of negotiations, the ensuing lockout is lawful notwithstanding the unremedied violation." Id. at 4 (emphasis added). Applying this standard, the Board in Peterbilt Motors found a lockout **lawful** despite the employer's seeking "significant concessions" while **unlawfully** failing to provide information regarding labor costs at other facilities. The Board should have applied Peterbilt Motors (issued 11 days before the decision in KLB's case) and found KLB's lockout lawful.

As KLB's lockout was lawful, KLB lawfully employed temporary replacement workers during the lockout and lawfully refused to provide health insurance to locked out employees. The Order should not be enforced with respect to these issues as well.

## **STANDING**

KLB has standing to challenge the Order because it was the respondent before the Board and because KLB is aggrieved by the Board's Order. 29 U.S.C. § 160(f).

# ARGUMENT

## A.    Standard Of Review

This Court should set aside the Order if the Board "acted arbitrarily or otherwise erred in applying established law to the facts, or when its findings of fact are not supported by 'substantial evidence' in the record considered as a whole." ConAgra, Inc. v. NLRB, 117 F.3d 1435, 1438 (D.C. Cir. 1997) (citations omitted). This Court does not "merely rubber-stamp NLRB decisions."  Avecor, Inc. v. NLRB, 931 F.2d 924, 928 (D.C. Cir. 1991).

In this case, the facts are largely undisputed.  But the Board majority erred in applying established law to these facts.  The Order should not be enforced.

## B.    KLB Did Not Unlawfully Fail To Provide Financial Information.

### 1.    The requested information was irrelevant because KLB did not plead poverty.

KLB did not plead poverty during negotiations.  (Order 3 n.7; D.A. ___) The Board dissent accurately cited the record evidence regarding **what was actually said during the negotiations** regarding the rationale for KLB's bargaining position.  (Order 6 n.3; D.A. ___)  KLB generally referred to competitiveness and to Asian competitors.  (Id.)  As the Board dissent recognized, the Board majority's assertion that KLB made "grave, specific, and recurring assertions of [KLB's] lack of competitiveness" is unsupported by the record.  (Id.) The Board majority cited no evidence in support of its assertion.

But even if KLB made "grave, specific, and recurring assertions of [KLB's] lack of competitiveness," the Board majority's conclusion that general statements about competitiveness require an employer to produce financial information contradicts Board precedent. Since the Supreme Court's decision in NLRB v. Truitt Mfg. Co., 351 U.S. 149 (1956), the Board has held that statements regarding an employer's desire to remain "competitive" do not trigger an obligation to provide verifying information unless the employer pleads poverty. In Nielsen Lithographing Co., 305 NLRB 697 (1991), the employer sought wage and benefit reductions and told the union (among other similar comments) that it was still "making a profit," but needed "these concessions to compete," because increasing "costs in the [expiring] contract" were resulting in significant losses of business to competitors. Id. at 697. The Board held:

> We therefore conclude that an employer's obligation under Truitt to provide a union with information by which it may fulfill its representative function in bargaining **does not extend to information concerning the employer's projections of its future ability to compete.** We consider that obligation to arise **only** when the employer has signified that it is **at present unable to pay** proposed wages and benefits.

Id. at 701 (emphasis added). Nielsen controls KLB's case.

Similarly, in Concrete Pipe & Products Corp., 305 NLRB 152 (1991), the Board found the employer had no obligation to produce information verifying its competitiveness assertion. The employer had told the union that its "business is

suffering a declining market due to the many new competitive products . . . ." and that "there has been intense competition from several concrete pipe producers." <u>Id.</u> at 152. The employer named specific competitors. <u>Id.</u> The employer told the union: "To survive in today's market we have got to be able to be competitive, and to be competitive, wage rates and benefits must be lowered. These are our Contract Proposals which we believe are necessary to accomplish what I have said." <u>Id.</u>

Similar to the Board majority in KLB's case, the ALJ in <u>Concrete Pipe</u> found that: "Respondent was under an obligation to produce sufficient financial information to enable the union properly to represent the employees' interests in the contract negotiations **by making an intelligent assessment of the Employer's need for concessions and the potential need to revise its wage demands**." <u>Id.</u> at 162 (emphasis added). The Board reversed: "As the Respondent simply asserted that it was not competitive and that it wanted to reduce its costs, it was not obligated to furnish economic information to the Union . . . ." <u>Id.</u> at 153.

More recently, the Board found an employer that did not plead poverty had no obligation to provide a union information regarding its "general and administrative expenses, including details on management salaries and benefits; the Respondent's operating plans, budgets, forecasts, or other documents dealing with projected costs and operating results; **and a list of all the Respondent's**

**competitors** . . . .” <u>North Star Steel Co.</u>, 347 NLRB 1364, 1369 n.23 (2006) (emphasis added).  Consistent with <u>Nielsen</u> and <u>Concrete Pipe</u>, the Board ruled: “In the absence of a present ‘inability to pay’ claim, we find that the requested financial and competitor information is not relevant to the Union’s bargaining representative duties.”  <u>Id.</u> at 1370.

This Court has set aside Board orders that, like the Order in KLB’s case, are unfaithful to <u>Nielsen</u>.  In <u>ConAgra, Inc. v. NLRB</u>, 117 F.3d 1435 (D.C. Cir. 1997), the employer proposed a wage reduction from $17.84 to $11.11.  <u>Id.</u> at 1437.  The employer told the union in bargaining that the proposal was “radical,” but that “we need to be competitive” and “we want the company to continue.”  <u>Id.</u>  In response to the employer’s “competitiveness” claim, the union asked for financial information, including a list of the employer’s clients for the past three years, sales information, contracts, information about non-union employees’ salaries, and comparative profitability and operational cost information.  <u>Id.</u> at 1437-1438.  The employer refused to produce information regarding financial statements, certain information about sales to competitors, and information about other ConAgra entities.  <u>Id.</u> at 1438.

This Court set aside the Board’s order finding a violation of the Act.  This Court ruled that:  “In our view, the facts relied upon by the Board in this case clearly fall on the other side of the <u>Nielsen</u> dividing line and are basically akin to

those in <u>Nielsen</u> and <u>Concrete Pipe and Products</u>." <u>Id.</u> at 1442. This Court

observed:

> In each of the three cases [<u>Nielsen</u>, <u>Concrete Pipe</u>, and
> <u>ConAgra</u>], the employers' representatives informed the
> union that the companies were profitable, but claimed
> that wage concessions were necessary in order to protect
> and improve their ability to compete. In the case before
> us, the Board leaned heavily on precise statements to this
> effect made by ConAgra's representatives, including: "If
> we do not take immediate measures there are
> probabilities we will not be here in the future," "I have
> seen the Company's decline during the last four years . . .
> [T]he situation is serious and fragile . . . [I]f we are not
> competitive we cannot survive . . . We must do
> something to be able to survive," and "[T]hings like [the
> provision that employees be provided with soap] are
> what makes us not be competitive and can make us have
> to close shop because we cannot compete." **We can
> discern no principled distinction between these
> statements and those the Board found insufficient to
> trigger a disclosure obligation in <u>Nielsen</u> and
> <u>Concrete Pipe and Products;</u>** indeed, some of the
> employers' statements in those cases seem **more** alarmist
> than their counterparts in this case.

<u>Id.</u> at 1442-1443 (citations omitted) (first emphasis added). KLB's general

comments about competitiveness during these negotiations are **less alarmist** than

the comments this Court found insufficient in <u>ConAgra</u>.

The Second Circuit has also denied enforcement to a Board order requiring

production of information similar to the information at issue in KLB's case. In

<u>Stroehmann Bakeries, Inc. v. NLRB</u>, 95 F.3d 218 (2d Cir. 1996), the employer's

representatives told the union that the employer had lost "$12 million in 1992, and

was projected to lose $16-20 million in 1993." Id. at 220. The employer described the bakery operation's losses as "disastrous" for "profitability." Id. The employer expressly denied an inability to pay, but told the union it "required a savings of approximately $150,000 annually in order to remain competitive." Id. In a letter to all employees, the employer stated that as a result of operating losses the employer "**cannot** continue to operate as we have in the past. We simply **cannot** afford it." Id. at 221 (emphasis in original).

The union responded with an information request seeking (among other information): (1) the names of the employer's primary competitors; (2) production and management reports from the last three years; and (3) a list of customer and sales accounts, accounts payable journals, supplier invoices, general ledgers, charts, and computer reports. Id. The employer did not provide any of this information. Id.

After the Board found a violation, the Second Circuit denied enforcement, stating: "Once Stroehmann conceded that it had access to capital sufficient to continue the Syracuse shipping unit, the Union's need for financial information to bargain intelligently was virtually non-existent." Id. at 223. The same is true in KLB's case.

The Board majority's decision would undo decades of Board law regarding pleading poverty. Were the Board majority right, any employer who sought wage

concessions would be required to provide financial information having nothing to do with the terms and conditions of employment at issue in the negotiations. Unions could always seek such information in order to "understand, evaluate, and possibly rebut [KLB's] assertions." (Order 3; D.A. ___) In fact, any time a union disagreed with any wage proposal (not even a concessionary proposal), it could seek financial information based on the Board majority's rationale.

The key fact (absent in KLB's case) that makes such information relevant is the employer's claim that **it cannot afford to meet the union's demands** (and that the union should therefore make concessions). Unions have the right to "delve into that claim" because it is so devastating in bargaining if true. If a plea of poverty is true, the employer could affirmatively want to agree to the union's terms, but would be unable to do so. There is nothing a union can do in the face of such a claim; even a strike could not force the employer to pay money it does not have. Unions therefore have the right under settled Board law to verify a plea of poverty. The Board majority's attempt to extend that right in KLB's case is legally unsupported and should be rejected.

The Board majority's attempt to bootstrap the relevance of the information at issue by noting that KLB introduced certain customer information **at trial** (Order 3; D.A. ___; KLB Exh. 13; D.A. ___) is without merit. The Board majority cited no evidence that KLB invoked lost customers (even generally) **during**

**negotiations**.  And even if KLB had invoked lost customers during negotiations

(generally or specifically), KLB never pled poverty.  As a result, the Union knew

that lost customers did not cause KLB to be unable to afford the Union's demands.

KLB introduced certain customer information **at trial** to defend itself.  At

trial, the General Counsel alleged that KLB engaged in surface bargaining and that

KLB's bargaining position (and lockout in support of its bargaining position) was

motivated by union animus.  These allegations required KLB to establish a

legitimate business reason for its proposals.  Under the burden-shifting analysis

used in Section 8(a)(3) cases, KLB could have had the burden of proof.  <u>NLRB v.</u>

<u>Transportation Management Corp.</u>, 462 U.S. 393 (1983).  KLB therefore

introduced information regarding its customers **at trial** to establish a legitimate

rationale for seeking cost savings.  The ALJ admitted that KLB provided this

information **at trial** "precisely to justify the claims of competitive pressures as the

motivation for its wage proposal." (Order 31; D.A. ___)

KLB's trial presentation cannot support the Board majority's conclusion that

the requested information was relevant despite <u>Nielsen</u> and other controlling

decisions.  The Board majority cited no authority supporting its conclusion.  The

Board dissent correctly observed:  "These statements could not have been the basis

for the Union's request, and it is irrelevant whether they indicate that [KLB] had

specific evidence in its possession if it had no legal obligation to produce it."

(Order 6 n.3; D.A. ___)

The decisions cited by the Board majority are inapplicable.  In Caldwell

Mfg. Co., 346 NLRB 1159 (2006), the employer made **specific factual assertions**

during negotiations, such as the claim that "its other plants were more competitive

than its Rochester plant and that its production costs were lower elsewhere; in

response the Charging Party requested cost data for each of the Respondent's

plants as well as the method the Respondent used to track productivity."  Id. at

1160 n.6.  KLB made only generalized competitiveness claims, not the specific

factual claims at issue in Caldwell.  The Union's information request in KLB's

case confirms this point; the information request repeatedly invokes

"competitiveness" and not any specific factual claim.  (Order 1-2; D.A. ___)

The employer in A-1 Door & Building Solutions, 356 NLRB No. 76 (2011),

also made specific factual claims.  The employer provided the union with the

names of specific competitors and asserted that it had lost job bids to these

competitors.  Id. at 3.  The Board found:

> That [job bid] information would have assisted the Union
> in evaluating, and responding to, the Respondent's
> repeated claim that it could not compete for contracts
> against other specifically-named companies because it
> was paying overly generous wages and benefits to unit
> employees.  **Given those assertions**, the Union was
> entitled to proof that Respondent was, in fact, losing
> contracts, and, if so, that the cause was unit employees'

> wage and benefit levels rather than other factors that
> could not be addressed through union concessions.

Id. at 4 (emphasis added).[4]  KLB made no such claims in this case.

KLB's case is controlled by Nielsen and Concrete Pipe, not Caldwell or A-1

Door.  As the Board dissent correctly stated:

> **I believe that the finding of a violation here represents
> an unwarranted expansion of the fact-specific
> holdings in *Caldwell* and *A-1 Door* in order to offset
> *Nielsen's* narrowing of an employer's obligation to
> provide information.**  The gist of my colleagues'
> opinion is that the union in *Nielsen* simply asked for the
> wrong information.  Had it asked for the same
> information as requested by the Union here, the employer
> would have a statutory obligation to provide it.  In other
> words, my colleagues hold that – in marked contrast to
> the analysis of inability to pay claims – there need not
> even be a specific negotiation claim of present inability
> to compete in order to trigger an employer's obligation to
> provide a broad range of nonunit information to a
> requesting union.  **This holding cannot be reconciled
> either with *Nielsen*** or with the *Truitt* requirement that,
> *even in inability to pay cases*, there must be a case-by-
> case factual examination of whether a union is entitled to
> evidence substantiating a bargaining claim.

(Order 7; D.A. ___) (bold emphasis added)  The dissenter in KLB's case **joined**

the A-1 Door opinion.

And even assuming Caldwell and A-1 Door are inconsistent with Nielsen

and Concrete Pipe, KLB still wins because the Board majority failed to overrule

---

[4] The information request at issue in E.I. Du Pont & Co., 276 NLRB 335 (1985),
was also directly responsive to the employer's specific job restructuring proposal.

Nielsen and Concrete Pipe or explain away the inconsistency.  See ConAgra, Inc.

v. NLRB, 117 F.3d 1435, 1444 (D.C. Cir. 1997) (declining enforcement when the

Board's order "rests on an unexplained (indeed an unacknowledged) departure

from the Board's precedent in Nielsen and other decisions . . . .").

As the information at issue was irrelevant, the Board majority's ruling that

KLB violated the Act by not providing it should not be enforced.

### 2.    KLB adequately responded to the costs savings request.

The Union requested that KLB provide it with a "complete calculation of the

projected company savings over the next three years . . . ."  (Order 2; D.A. ___)

KLB provided the Union with the requested savings projection.  (Id.)  The Board

majority found that KLB needed to provide more detail regarding its calculations.

(Order 2 n.6; D.A. ___)

The Board majority's ruling should not be enforced.  The Union knew the

proposed wage decrease and the current wage rates of its 16 members.  The Union

therefore already had all the information it needed to check KLB's savings

calculations.  The Board majority cited no precedent supporting its conclusion that

KLB's response was legally deficient.  The Board majority did not even attempt to

explain what else the Union needed from KLB or why the Union could not verify

KLB's savings calculations based on information already within the Union's

possession.

KLB need not perform basic math for the Union when the Union already has the information needed to perform its own calculations.  Procter & Gamble Mfg. Co., 160 NLRB 334, 389 (1966) ("Since the Union had the raw data and understood the mathematical procedure of factoring and unfactoring, it plainly was not asking the Company for information not in its possession but rather requesting the Company to make certain computations on the basis of data equally available to the Union.").  KLB need not provide information to the Union in the exact format requested by the union.  Cincinnati Steel Castings Co., 86 NLRB 592, 593 (1949).  As the Union did not need additional information, the Board majority's conclusion should not be enforced.

### 3.      The Union's information request was made in bad faith.

In addition to being irrelevant, the Board should have found that the Union's October 4 information request was a sham designed to prevent KLB from reaching impasse.  The undisputed facts establish that conclusion.

First, the timing of the information request reveals its tactical nature.  KLB made its Final Offer on October 3.  (Order 15-16; D.A. ___)  At that bargaining session, the mediator turned to the Union and said:  "I guess we're at impasse then." (Order 16; D.A. ___)  The Union immediately denied being at impasse. (Id.)  The Union's information request followed the very next day.

The Union's behavior in bargaining **before** making the October 4 information request shows its tactical nature.  The Union bargained with KLB until the Final Offer (and the discussion of impasse) without seeking any of this information.  The Union submitted KLB's September 30 contract offer to its membership that day without seeking any of this information.  (Order 15; D.A. ___)  The Union tentatively **agreed to accept KLB's Alternative Insurance** proposal on September 30 without seeking the health insurance information it requested only on October 4.  (Order 14; D.A. ___)  The Union's September 30 wage offer was closer to KLB than the Union's wage offers following the October 4 information request.  (Id.)  What changed between September 30 and October 4 to make the Union realize that it needed voluminous information (including information about tentatively agreed topics)?  The answer is KLB's Final Offer (and its implicit impasse threat) and the impasse threat explicitly presented by the mediator's statement on October 3.

The substance of the Union's October 4 information request also reveals its tactical nature.  The Union sought information about health insurance despite the Union's tentative acceptance of KLB's Alternative Insurance proposal on September 30.  The Union **never** involved its health insurance experts in these negotiations and its experts did not participate in preparing this information request (although a Union expert did testify at trial).  (Order 29; D.A. ___)  What

legitimate interest could the Union have in voluminous health insurance

information under these circumstances?  The Union sought information about

KLB's customers, pricing, and many other topics having nothing to do with

anything discussed during the negotiations.  For example, the Union sought

information about outsourcing even though outsourcing was **never** discussed

during negotiations.  (Tr. 995, 1017, 1025, 1040, 1048, 1057-1058, 1227-1228;

D.A. ___)  The Union **withdrew** its boilerplate proposal banning outsourcing

(never discussed during bargaining) on September 30.  (Order 14; D.A. ___)

    The Union's behavior **after** making the October 4 information request

further confirms its tactical nature.  The Union worked with KLB to develop the

timed offer on October 5 and submitted the timed offer to its membership for

ratification on October 8 without claiming that a lack of information in any way

hindered the Union from assessing KLB's timed offer (or Final Offer).  (Order 17-

18; D.A. ___)  The Union did not mention the October 4 information request

during the October 10 or 16 bargaining sessions.  The Union only invoked the

information request on October 21, immediately following KLB's lockout

announcement.  (Order 20; D.A. ___)

    The Union must make information requests in good faith to obligate KLB to

respond.  (Order 4 n.11; D.A. ___)  In <u>ACF Indus., LLC</u>, 347 NLRB 1040 (2006),

the union requested information related to an employer's health and welfare benefit

plan after months of bargaining, after the contract's expiration, and after the

union's rejection of the employer's final offer regarding a health care plan.  Id. at

1043.  "Significantly, the Union requested this information on the same day that it

disputed the Respondent's contention that the parties were at impasse."  Id.  The

Board found that "the Union's information request was purely tactical and was

submitted solely for purposes of delay."  Id.

The Board should have reached the same conclusion here and further found

that KLB did not have to respond to a "purely tactical" information request.  The

Board's Order regarding the information request should not be enforced for this

reason as well.

### C.     The Lockout Was Lawful.

As KLB did not unlawfully fail to provide any information to the Union, the

Board majority's ruling that the lockout was tainted by this unfair labor practice

must be set aside.  But even assuming KLB unlawfully failed to provide

information, the lockout was still lawful.

### 1.     The Board majority's ruling that the lockout was unlawful should be set aside because it rested solely on the erroneous ruling that KLB unlawfully failed to provide information.

As the Board majority's opinion that KLB unlawfully failed to provide

information should not be enforced, the Board majority's ruling that the lockout

was unlawful based on the failure to provide information should also not be

enforced.  ConAgra, Inc. v. NLRB, 117 F.3d 1435, 1445 n.8 (D.C. Cir. 1997) (finding lockout lawful after denying enforcement to Board rulings underlying the Board's conclusion that lockout was unlawful).  It is undisputed that KLB could lawfully hire temporary replacement workers if the lockout was lawful.

> **2.  The Board's finding that KLB bargained in good faith overall requires the conclusion that the lockout in support of KLB's good faith bargaining position was lawful.**

The Board dismissed the allegation that KLB engaged in surface bargaining. (Order 1 n.2; D.A. ___)  The dismissal of this allegation requires the conclusion that the lockout in support of KLB's Final Offer (made after bargaining in good faith) was lawful.

KLB's lockout was in support of its Final Offer.  (Order 39; D.A. ___) KLB's Final Offer was made on October 3, **before the October 4 information request.**  (Order 15-16; D.A. ___)  The Union's best pre-lockout offer was made on September 30, **before the information request**.  (Order 14; D.A. ___)  The Union significantly regressed from its September 30 offer on October 2, **before the information request.**  (Order 15-16; D.A. ___)  As the Board dissent correctly recognized:

> [KLB's] proposals for wage concessions were not themselves unlawful, and the parties had bargained about them to the point of entrenched positions verging on impasse **before the Union even made its information request.**  The subsequent lockout was for the legitimate

> purpose of pressuring the Union to agree to [KLB's]
> lawful bargaining proposals.  **The refusal to provide the
> requested information had nothing to do with it.**

(Order 8; D.A. ___) (emphasis added)

As KLB bargained in good faith overall and made its Final Offer before the

Union's information request, the Sixth Circuit's decision in Horsehead Resource

Development Corp. v. NLRB, 154 F.3d 328 (6th Cir. 1998), should be persuasive.

The Sixth Circuit found:  "Our conclusion that the Board had no legitimate basis

for finding Horsehead guilty of bargaining in bad faith is dispositive of the

question whether the lockout was unlawful."  Id. at 340.

Under the particular circumstances of this case,[5] this Court should reach the

same conclusion and find KLB's lockout lawful based on the dismissal of the

surface bargaining allegation regardless of the information request issue.

> **3.    The lockout was lawful under the Board's recently
>         announced standard which the Board majority failed
>         to apply.**

Even assuming KLB's lockout should not be found lawful based on the

dismissal of the surface bargaining allegation, the lockout was still lawful under

the Board's recently announced standard governing this issue.  In Peterbilt Motors

Co., 357 NLRB No. 13 (2011), which issued eleven days before the Order in

KLB's case, the Board announced:

---

[5] KLB is not suggesting a per se rule that dismissal of a surface bargaining
allegation validates a lockout.

> Although nowhere expressly stated, the standard consistently, if implicitly, applied by the Board is that **where the unlawful withholding of the information did not materially affect the progress of negotiations**, the ensuing lockout is lawful notwithstanding the unremedied violation.

Id. at 4 (emphasis added).

In KLB's case, there is no evidence (much less substantial evidence) that the progress of negotiations was affected at all, much less **materially affected**, by KLB's refusal to provide the information at issue. The ALJ recognized:

> As reflected in their opening proposals, the parties entered negotiations with vastly different goals. The Union felt that employees' wages were low, and anticipated and sought wage increases over the life of the new contract with additional economic and noneconomic changes that would benefit employees. Although I attribute it to posturing, at one or more times in negotiations Young indicated to KLB that the union employees would not agree to a concessionary contract. KLB, on the other hand, came to the table determined to cut labor costs.

(Order 10; D.A. ___ )

Consistent with the ALJ's finding, the parties never came close to each other on wages. The Union made its best pre-lockout wage offer (no increase in the first year and a 20 cent and 10 cent increase in years two and three) on September 30, **before the information request**. (Order 14; D.A. ___ ) The Union regressed significantly on wages (as well as other issues) to increases of $1.50 the first year and 80 cents in years two and three on October 2, **before the information request**.

(Order 15; D.A. ___)  KLB made its Final Offer on October 3, **before the information request**.  (Order 15-16; D.A. ___)  At the time of the lockout, the Union's wage proposal was for 80 cent increases all three years, farther away from KLB than the Union's September 30 offer.  (Order 18; D.A. ___)[6]

These facts preclude a finding that the information request materially affected the negotiations.  The Board found KLB bargained in overall good faith.  (Order 1 n.2; D.A. ___)  The lockout was in support of KLB's Final Offer, made before the information request.  The evidence establishes that the Union wanted more than KLB was willing to pay after KLB bargained in good faith.  The information request had nothing to do with this deadlock.

In addition, the Board found that KLB did not plead poverty in this case.  (Order 3; D.A. ___)  So the deadlock over wages was necessarily caused by KLB and the Union's unwillingness to agree to each other's wage proposals.  **The Union knew KLB could afford the Union's proposals regardless of its competitive position.**  The Union had always said it would not agree to a concessionary contract.  (Order 10; D.A. ___)  The Union's actions during these negotiations confirmed its words.

The Union's actions both before and after the October 4 information request confirm that the information request did not affect, much less materially affect, the

---

[6] The ALJ mistakenly indicated the Union proposed "$.080" wage increases each year on October 10.

bargaining.  The Union submitted KLB's September 30 offer to its membership without requesting this information.  (Order 15; D.A. ___)  The Union's chief negotiator worked with KLB to develop the timed offer and submitted that offer to the Union membership for ratification on October 8 without claiming to need the information to assess that offer.  (Order 17-18; D.A. ___)  The Union met with KLB on October 10 and 16 after rejecting KLB's timed offer without mentioning the information request or asserting that the Union needed more information to assess KLB's offer.  (Order 18; D.A. ___)  The Union met with KLB after the lockout without mentioning the information request.  (Order 20-21; D.A. ___)

Although this Court need not find the Union's information request was made in bad faith in order to find the information request did not materially affect the negotiations, it is undeniably true that:  (1) the information request was made only after KLB's made its Final Offer and the mediator said the parties were at impasse; and (2) the Union next invoked the information request immediately after KLB announced its intent to engage in a lockout.  As the Second Circuit observed in Stroehmann Bakeries, Inc. v. NLRB, 95 F.3d 218 (2d Cir. 1996):  "It was the Union that refused to bargain after it made a request for financial information better designed to create a legal issue than to inform bargaining."  Id. at 223.  This observation applies to KLB's case and these facts show the information request did not materially affect the negotiations.

Had the Board majority considered its recent <u>Peterbilt Motors Co.</u>, 357 NLRB No. 13 (2011), the Board would have been compelled to find KLB's lockout lawful.  In <u>Peterbilt Motors</u>, the employer told the union during negotiations that the "Madison plant had the highest operating costs in the company." <u>Id.</u> at 1.  Based on this specific claim, the union sought information regarding the employer's other three production facilities.  <u>Id.</u>  The union's lead negotiator also stated that "the Union needed the information to make a proposal." <u>Id.</u>  The employer locked out the employees a few days later.  <u>Id.</u> at 2.  Subsequent correspondence from the union stated that "[b]efore we can make an informed decision about the concessions that you've proposed, we need to know if the costs at Madison are in fact comparatively high."  <u>Id.</u>  The employer refused to provide the requested information.  <u>Id.</u>

Although the Board found the employer **unlawfully** failed to provide the requested information, the Board found the employer's lockout **lawful**.  The Board reasoned:

> [T]he parties were far apart in bargaining on issues both parties deemed to be fundamentally important.  The parties continued to meet and bargain after the lockout began and after the Respondent refused to provide the requested information.  **There is no evidence that the outstanding information request was a stumbling block to bargaining.**  Although the Union reiterated its request on July 8, there is no evidence that it ever claimed, after the Respondent refused on July 16 to provide the requested information, that it was precluded

from evaluating the Respondent's proposals or formulating its own counterproposals because it lacked the requested information.  **In fact, the parties held three bargaining sessions after July 16, and there is no evidence that the Union even raised the outstanding information request as an issue at any of these sessions.**

Id. at 4 (emphasis added).

As in Peterbilt Motors, the Union in the present case met with KLB on several occasions (both before and after the lockout) without mentioning the information request or claiming that the lack of information hindered the Union from making proposals or assessing KLB's proposals.  The Union could not have credibly done so, as the Union submitted KLB's timed offer to the membership for ratification on October 8 without any of the requested information.  On October 10, the Union told KLB it rejected the timed offer because the wages were "unacceptable," not because it needed more information to assess the offer.  (Order 18; D.A. ___)  The Union met with KLB on October 16 before the lockout and three more times after the lockout and made new proposals without mentioning the information request.  (Order 20-21; D.A. ___)  The Union's October 21 letter complaining about KLB's response to the information request and objecting to the lockout is no better than the union's insufficient assertions in Peterbilt Motors that it needed the requested information to make proposals and to consider that employer's concessionary proposals.

In finding KLB's lockout unlawful, the Board majority did not mention the

Peterbilt Motors standard or attempt to distinguish the decision.  (Order 4-5; D.A.

___)[7]  As a result, the Board majority's Order should not be enforced.  ConAgra,

Inc. v. NLRB, 117 F.3d 1435, 1443-1444 (D.C. Cir. 1997).

Instead of applying the "materially affects" standard, the Board majority in

KLB's case relied on an flawed syllogism:  (1) wages were an important issue in

bargaining; (2) the Union's information request purportedly was "designed to

enable the Union to evaluate and respond to that proposal"; so (3) KLB could not

engage in a lockout without first providing the information.  (Order 5; D.A. ___)

First, this syllogism would have also required the lockout at issue in Peterbilt

Motors to be found unlawful.  The union purportedly needed the information

withheld in Peterbilt Motors so it could "make an informed decision about the

---

[7] The cases the Board majority did cite are inapplicable.  In Clemson Bros., Inc.,
290 NLRB 944 (1988), the Board found the lockout unlawful because:  "Here, as
the judge found, the lockout was motivated by the Respondent's wish to avoid the
COLA payment, a matter about which we have found the Respondent refused to
bargain in good faith."  Id. at 945 n.10.  Further, the employer pled poverty and
refused to provide substantiating information.  Id. at 944.  KLB did nothing of the
sort.  In Globe Business Furniture, Inc., 290 NLRB 841 (1988), the employer
failed to provide information about insurance costs for bargaining unit employees
(a term and condition of employment) which caused ongoing conflict during the
negotiations and prevented the union from costing proposals.  The ALJ found:  "It
is clear that the Union's objection to the Company's 'final proposal' was that it
was not accompanied by relevant information that the Union needed in order to
evaluate it, and that this objection was communicated to the Company."  Id. at 853.
There was a "material effect" on the bargaining in Globe Business Furniture that is
absent in KLB's case.

concessions that you've proposed . . . ."  357 NLRB No. 13 at 2 (2011).  The

information at issue related directly to the employer's specifically claimed need for

concessions (the plant's having the "highest operating costs in the company").  <u>Id.</u>

at 1.

    Second, the syllogism is unfaithful to the <u>Peterbilt Motors</u> standard.  Rather

than focus on the information request's impact on the bargaining (non-existent in

KLB's case) as required by <u>Peterbilt Motors</u>, the Board majority shifted the focus

to the impact of the wage topic on the negotiations.  That is **not** the right standard.

Even if **wages** were a "stumbling block" in KLB's case, the parties bargained over

wages before and after the information request without any difficulty and without

the Union invoking the **information request** as a "stumbling block."  The Union

did **not** come back to KLB on October 10 after its members rejected the timed

offer and claim that the membership did not understand or accept KLB's wage

proposal **because it lacked information**.  The Union simply said the wages were

"unacceptable." (Order 18; D.A. ___)  As the Board dissent correctly recognized,

"The refusal to provide the requested information had nothing to do with it."

(Order 8; D.A. ___)

    At bottom, the Union had the right not to agree to wage concessions it found

"unacceptable."  But KLB also had the right not to agree to wage increases and to

lock out the Union to try to secure an agreement on KLB's terms after bargaining

in good faith.  The Board majority erroneously waded into this economic dispute and tried to tilt the balance in favor of the Union by finding an unfair labor practice that would devastate KLB if upheld.  This Court should correct that error.

**4.    The Board's own findings show a deadlock over health insurance unrelated to any information request.**

In addition to the above, the Board's own findings show that the parties had a lingering dispute over health insurance that prevented agreement independent from the wage issue.  The Board found that KLB did not unlawfully fail to provide the Union with information regarding health insurance.  (Order 1 n.3; D.A. ____)

The ALJ assumed that the parties had a dispute over health insurance "coverage," with KLB's Final Offer proposing coverage "substantially similar" to the current health insurance and the Union demanding that coverage be the same as the current insurance.  (Order 26 n.25; D.A. ____)  On January 30, 2008, the Union changed its position and proposed the current health insurance (apparently abandoning its previous willingness to agree to the Alternative Insurance).  (Order 20-21; D.A. ____)  On March 28, 2008, the Union continued to propose the current health insurance at a different level of cost-sharing.  (Order 21; D.A. ____)  These undisputed facts establish a deadlock over the Alternative Insurance's "coverage" that goes back to KLB's Final Offer (made before the Union's information request) and over the Alternative Insurance as opposed to the current insurance as of January 30, 2008.

Based on these facts, the Board majority should have found the lockout lawful based on these health insurance disagreements which had nothing to do with an alleged failure to provide information. <u>Sierra Bullets, LLC</u>, 340 NLRB 242, 244 (2003) (unfulfilled information requests did not prevent a lawful impasse given a legitimate deadlock on issues unrelated to the unfulfilled requests); <u>Central Ill. Publ. Serv. Co.</u>, 326 NLRB 928, 936 (1998).

This Court should deny enforcement to the Board majority's order regarding the lockout for this reason as well.

### D.    KLB Lawfully Cancelled Health Insurance For Lawfully Locked Out Employees.

KLB's right to discontinue health insurance for lawfully locked out employees stems from two independent sources. First, KLB has a statutory right under the Act not to subsidize employees during a lawful lockout, which would perversely undercut KLB's own economic weapon. Second, the status quo established by the expired contract (and maintained by operation of law) authorized KLB to terminate health insurance when employees are "off work for any reason other than circumstances which expressly give rise to insurance benefits hereunder." (Order 41; D.A. ___)

Under the law, KLB may treat locked out employees like strikers in this context. <u>Sargent-Welch Scientific Co.</u>, 208 NLRB 811, 820 (1974). KLB accordingly may discontinue payment of health insurance premiums on behalf of

striking or locked out employees during the strike or lockout.  Id.  See also

Sherwin-Williams Co., 269 NLRB 678 (1984); Simplex Wire & Cable Co., 245

NLRB 543 (1979); Trading Port, Inc., 219 NLRB 298, 299 n.3 (1975).

Exercising this right, KLB discontinued the health insurance of the locked

out employees after the lockout began.  (Order 41; D.A. ___)  Because the group

health plan at issue was populated entirely by locked out employees, there was no

ongoing group insurance to enable the three locked out employees who attempted

to elect COBRA to do so.  (Order 20, 41 n.51; D.A. ___)[8]

The Board disregarded the above cases and ignored KLB's statutory right

not to subsidize the locked out employees during the labor dispute.  KLB's

exercise of its statutory right in this case unintentionally eliminated the potential

COBRA eligibility of locked out employees.  Although the loss of COBRA

eligibility perhaps distracted the Board, that impact had nothing to do with the

lawfulness of KLB's initial action.  The Board's order therefore should not be

enforced.

---

[8] Despite having no obligation to do so, KLB tried to enable locked out employees
to elect COBRA by repurchasing the group insurance plan.  (Order 42 n.51; D.A.
___)  After learning this was not possible, KLB unsuccessfully tried to add the
locked out employees to the office plan.  (Id.)  KLB then had its insurance broker
work with locked out employees to help them secure individual insurance policies.
(Id.)  KLB also offered to pay the difference between the COBRA continuation
cost and the cost of individual insurance.  (Id.)

Furthermore, the status quo established by the expired contract authorized KLB to terminate health insurance under these circumstances. The ALJ partially recognized this fact. The ALJ assumed that health insurance would have been lawfully terminated by the end of November based on a provision of the expired contract that provided for termination of health insurance benefits "no later than the end of the month following the month in which an employee is laid off or is off work for any reason . . . ." (Order 41; D.A. ___) The ALJ (affirmed by the Board) apparently thought this contract provision **required** KLB to continue to provide health insurance to the locked out employees until the end of November without regard to the legality of the lockout unless the Union agreed to the discontinuation. (Order 5 n.13, 41; D.A. ___, ___)

The Board misinterpreted the expired contract provision. This Court reviews the Board's interpretation of the expired contract provision de novo. NLRB v. United States Postal Service, 8 F.3d 832, 837 (D.C. Cir. 1993). The Board did not dispute that the lockout resulted in employees being "off work" within the meaning of the expired contract provision, triggering the termination provision. But contrary to the Board's view, the expired contract provision did not mandate **continuation** of health insurance until the end of November. It provided for termination "**no later than**" the end of November. KLB terminated the health insurance "no later than" the end of November, which was perfectly consistent

with KLB's rights under the status quo established by the expired contract. Implicitly confirming this conclusion, the Union did not request bargaining under these circumstances despite notice.  (Tr. 1293; D.A. ___)

KLB need not bargain over its exercise of existing rights under the expired contract, which were part of the status quo.  See NLRB v. United States Postal Service, 8 F.3d 832, 837 (D.C. Cir. 1993) ("[W]here the employer acts pursuant to a claim of right under the parties' agreement, the resolution of the refusal to bargain charge rests on an interpretation of the contract at issue.").  As KLB did not violate the expired contract by terminating health insurance under these circumstances, the Board's contrary order should not be enforced for this reason as well.

## CONCLUSION

For each and all of the foregoing reasons, KLB respectfully requests that this Court grant KLB's petition for review and deny the Board's cross-application for enforcement.  This Court should find:  (1) KLB did not unlawfully fail to provide information; (2) KLB's lockout was lawful; (3) KLB lawfully hired temporary replacement workers during the lockout; and (4) KLB lawfully discontinued health insurance for locked out employees.  The Board's remedial order should be modified consistent with the above findings.

Respectfully submitted,

/s/ Kerry P. Hastings
Kerry P. Hastings
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
Phone:  (513) 381-2838
Fax:  (513) 381-0205
E-mail:  hastings@taftlaw.com

Attorney for Petitioner KLB
Industries, Inc.

12405704.1

## <u>CERTIFICATE OF COMPLIANCE</u>

In compliance with Federal Rule of Appellate Procedure 32(a)(7)(C), KLB

certifies that this brief complies with Federal Rule of Appellate Procedure

32(a)(7)(B)'s type-volume limitation because the brief contains 11,068 words,

excluding the parts of the brief exempted by Federal Rule of Appellate Procedure

32(a)(7)(B)(iii), and uses proportionally-spaced, 14-point Times New Roman font.

Respectfully submitted,

/s/ Kerry P. Hastings
Kerry P. Hastings
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
Phone:  (513) 381-2838
Fax:  (513) 381-0205
E-mail:  hastings@taftlaw.com

Attorney for Petitioner KLB
Industries, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Petitioner's Opening Brief was electronically filed with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit this 22nd day of December, 2011 using the appellate CM/ECF system, which will serve Linda Dreeben, Ruth A. Burdick, and David Seid, counsel for Respondent National Labor Relations Board by CM/ECF, and will serve Blair Catherine Simmons, counsel for Intervenor International Union, Automotive, Aerospace and Agricultural Implement Workers of America by CM/ECF.

A copy of the foregoing Petitioner's Opening Brief was also served upon: (1) David Seid, National Labor Relations Board, 1099 14th Street, N.W., Washington, D.C. 20570; (2) Blair Catherine Simmons, International Union, UAW, 8000 East Jefferson Avenue, Detroit, MI 48214; and (3) Frederick J. Calatrello, National Labor Relations Board Region 8, 1240 East Ninth Street, Room 1695, Cleveland, OH 44199-2086, via regular United States mail, postage pre-paid this 22nd day of December, 2011.


s/ Kerry P. Hastings